**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 20-CR-564-JPO |
| | ) | |
| CRAIG ZABALA, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>DEFENDANT CRAIG ZABALA'S SENTENCING MEMORANDUM</u>**

Michael P. Kelly
AKERMAN LLP
750 Ninth Street, N.W.
Washington, D.C. 20001
Telephone: (202) 393-6222
Facsimile: (202) 585-6223
michael.kelly@akerman.com

Counsel for Defendant Craig Zabala

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................1

BACKGROUND ...............................................................................................3

    I.        Craig's Upbringing ............................................................. 3

    II.      Craig's Career Before the Offense .........................................5

    III.     Craig's Personal Life .............................................................8

    IV.    Craig's Impact on the Community .........................................9

    V.      The Circumstances of the Offense.......................................11

    VI.    The Aftermath of the Offense ..............................................14

DISCUSSION .................................................................................................15

    I.        The Weighing of the Nature of the Offense
              and Craig's History and Personal Characteristics ..................17

    II.      The Proposed Sentence Would Reflect the Seriousness of the Offense,
              Promote Respect for the Law, Provide Just Punishment and
              Afford Adequate Deterrence ...............................................20

    III.     The Stipulated Guidelines Range Would Be More
              Than Necessary to Satisfy the Objectives of Section 3553 ..................21

    IV.    Other Sentences Have Departed From
              the Guidelines Range In View of Similar Factors .................23

    V.      The Need to Provide Restitution to Victims of the Offense .................25

    VI.    The Court Should Consider the Possibility of Home Confinement
              In Light of the Continuing Uncertainties of COVID-19 .......................25

CONCLUSION ...............................................................................................27

# TABLE OF AUTHORITIES

**Cases**                                                                                                                   **Page(s)**

*Gall v. United States*,
552 U.S. 38 (2007)..................................................................................................................16

*United States v. Booker*,
   543 U.S. 220 (2005)..........................................................................................................26

*United States v. Cooper,*
   No. 13 Cr. 66 (JPO), 2020 WL 4195273, at *2 (S.D.N.Y. June 11, 2020) ............................26

*United States v. Lahey*,
   186 F.3d 272 (2d Cir. 1999)................................................................................................26

*United States v. Navnoor Kang*,
   Criminal Action No. 16-837 (S.D.N.Y.) ..............................................................................23

*United States v. Suresh Hiranandaney, et al.*,
   Criminal Action No. 14-409 (S.D.N.Y.) ..............................................................................24

**Statutes**

18 U.S.C. § 371....................................................................................................1, 12, 25

18 U.S.C. § 3553 ...................................................................................................... passim

18 U.S.C. § 3561..........................................................................................................26

18 U.S.C. § 3563(b)(19) ...............................................................................................26

18 U.S.C. § 3583............................................................................................................16

28 U.S.C. § 994(a) .......................................................................................................16

U.S.S.G. §§ 5B1.1 and 5C1.1(f) ....................................................................................26

**Other Authorities**

FINRA, Rule 8210 (2013) ............................................................................................13

*The Impact of an Aging Inmate Population on the Federal Bureau of Prisons, U.S. Department
   of Justice Office of Inspector General Report,*  Feb. 2016,
   https://oig.justice.gov/reports/2015/e1505.pdf (last visited on January 22, 2021) ..........19, 20

*Federal Bureau of Prisons Coronavirus Webpage* https://www.bop.gov/coronavirus/ (last
visited on January 22, 2021) ..................................................................................................25

*Federal Bureau of Prisons - COVID-19 Vaccination Efforts Commended*
https://www.bop.gov/resources/news/20210116_covid_vaccine_efforts_commended.jsp (last
visited on January 22, 2021) ..................................................................................................25

Booth, William, *Boris Johnson Says British Coronavirus Variant May be More Deadly*, WASH.
POST, Jan. 22, 2021, https://www.washingtonpost.com/world/europe/uk-variant-covid-
mortality/2021/01/22/86023180-5cd6-11eb-a849-6f9423a75ffd_story.html.........................25

## <u>INTRODUCTION</u>

On February 5, 2021, Craig Zabala will appear for sentencing before the Court.  For over six decades, Craig led a law-abiding and exemplary life.  From an early age, he learned the value of hard work, earning a doctorate from UCLA while working as a full-time autoworker at General Motors.  He worked as a government economist, taught at some of the country's leading universities, and built a career in the world of finance.  At the same time, he tried to treat people with kindness and consideration, leading friends to say things like "it's impossible to summarize adequately how much Craig means to my family . . . ."  After three failed marriages, Craig found happiness and established a 23-year relationship with the love of his life, Doreen McCarthy.  Craig had good reason to be proud.

But his pride and fear of failure led him to make serious mistakes as he tried to raise money for one of his companies, Concorde Group Holdings, Inc. ("Holdings").  While using a private placement memorandum that described the proposed used of funds (including the investment of funds in other companies affiliated with Craig), he and a managing director failed to make accurate statements to investors about how much money had already been raised for the company.  Craig continued to send the managing director to solicit investors even after knowing that the managing director had made false statements to investors.  In doing so, Craig pressed forward and tried to make Holdings into a successful company.  That was a terrible mistake.

Craig was arrested on September 24, 2020.  Within four weeks of the arrest, he immediately accepted responsibility for his actions, directed his attorney to negotiate a plea agreement, and pled guilty to a conspiracy charge under 18 U.S.C. § 371.  He agreed to a forfeiture order and money judgment of $4.38 million, which represented all of the money invested by all of the investors in Holdings.  He also reached an agreement with the enforcement

staff of the Securities and Exchange Commission to settle a related civil action brought on the day of his arrest. He has tried to respond to his current circumstances in a responsible way.

At the age of 69, Craig now faces sentencing. The stipulated Sentencing Guidelines and the Probation Office recommend the maximum sentence of sixty months, but that is more than necessary to satisfy the sentencing objectives of 18 U.S.C. § 3553. In this case, I respectfully submit that the objectives of Section 3553 would be satisfied by (i) a term of confinement of a year and a day; (ii) a period of supervised release of three years with an order to complete 500 hours of community service during that time period with a focus on speaking to students about the mistakes that Craig made; and (iii) a restitution order encompassing the $4.38 million forfeiture and money judgment that the Court has already ordered. This sentence would be tailored to the full circumstances of the offense as well as Craig's history and characteristics. Because it would impose a period of confinement and significant additional obligations on a 69-year old man who otherwise has led a good life, it would reflect the seriousness of the offense, promote respect for the law, and provide just punishment.

Craig's mistakes have already cost him dearly. He lost his cherished relationship with his girlfriend, who has decided after his arrest that their 23-year relationship is over. He has lost his reputation that he spent a lifetime building. And once his settlement with the SEC's enforcement staff is officially approved by the Commission, he will be barred by the SEC from being associated with any broker, dealer, investment adviser, municipal advisor, transfer agent, or nationally recognized statistical rating organization. An examination of his life and circumstances would deter anyone from repeating his mistakes. Moreover, he is not a threat to commit any other offense, and there is no need for deterrence that would justify sentencing him to prison until he is 73 or 74 years old. Because of COVID-19 and the substantial uncertainties

that still arise from the disease, the Court should consider the possibility of ordering Craig to serve any sentence in home confinement. This would be an appropriate and just resolution of this case.

**BACKGROUND**

**I.      Craig's Upbringing**

In 1952, Craig was born in Santa Barbara, California to Romeo and Lorraine Zabala. He grew up in Lakewood, south of Los Angeles, as part of a large, close-knit family. His father was an artist who worked for the City of Los Angeles and helped to manage the City's art galleries. His mother worked as a nurse for 47 years before she retired. Craig grew up with an older sister (Robin), a younger sister (Patrice), and three younger brothers (Jeffrey, James, and Anthony). Craig's family was a working class family, and Craig tried to help the family's finances by working small jobs as a child. His father passed his love of art to Craig, taking Craig as a child to art exhibitions and openings.

Craig tried to serve as a positive role model for his younger siblings and cousins. His cousin, Caron Salazar, noted that "[f]rom an early age, [Craig] was always working." Salazar Letter at 2. In 1967, when he was 15 years old, Craig started working as an attendant for the art galleries that his father managed. He also worked hard in school and eventually earned a full scholarship to UCLA as an undergraduate student and a fellowship as a graduate student. His younger brother, Jim, reported that "Craig's academic achievements were primary motivations for me wanting to attend UCLA and receive my degree." J. Zabala Letter at 1. Caron Salazar observed that Craig "without a doubt was the one tagged to 'make it' in the world and I believe 'success' came at a cost for Craig, trying to please family and trying [to] create his own life." Salazar Letter at 1.

While at UCLA, Craig began an intense interest in academics that continues to this day. In 1974, he graduated from UCLA, *magna cum laude*, with a bachelor's degree in sociology. He earned a master's degree in sociology in 1977 and earned his PhD in 1983 from UCLA. During this time period, Craig was particularly interested in studying labor-management relations. To gain practical knowledge of the field and to inform his studies, Craig decided to obtain a full-time job as an autoworker at a General Motors plant in Van Nuys while he pursued his master's and doctoral degrees at UCLA.

In trying to combine his academic studies with a full-time job, Craig chose a very difficult path. On many days, Craig attended classes from 10 am to 1 pm. He then worked as a teaching assistant from until 3:15 pm or so. He worked the second shift at the GM plant, working from 4:18 pm until 1:18 am in the morning. He worked as an assembler on the door line of the body shop at the plant. As vehicles rolled along the assembly line, Craig's job was to install doors on FireBirds and Camaros (along with a few Novas and Pontiacs). For each car, he had 54 seconds to remove the door (weighing roughly 100 pounds) from a nearby rack, fit the door to the car, and then install six bolts to secure the door to the car. He had the ability to use a hoist to lift the door, but he often chose to lift the door manually in order to save time. He was expected to install doors on approximately 500 cars during the course of a typical shift. It made for a very long day that was physically exhausting, which he would repeat the next day and onward for years. He often worked six days a week at the plant while pursuing his graduate degrees.

Craig's hard work paid off. Using the insights he developed from his work at General Motors, in 1983, Craig successfully published and defended a 647-page dissertation on collective bargaining and plant management, focusing on UAW Local 645's bargaining at the GM plant in

Van Nuys.  Craig also spoke at other universities about his developing expertise.  In 1977, he gave a presentation at University of California, Irvine about "The Study of Emerging Shopfloor Production Relations using Ethnographic Research Methods:  Assembly-line Work at General Motors."  In July 1978, his paper about "Industrial Sabotage in the Automobile Industry" was read at the IX World Congress of Sociology in Uppsala University in Uppsala, Sweden.  Though he had received a travel grant to Sweden for the Congress, he stayed behind in order to work at the plant.

## II.   Craig's Career Before the Offense

After starting as an art gallery attendant and an autoworker, Craig embarked on a long and varied professional career over the following four decades, working as a government economist, a college professor, an investment adviser, and an entrepreneur.  While completing his dissertation, Craig moved to Washington, D.C. in 1979, and began a doctoral fellowship with the United States Department of Labor, where he researched productivity and cost measurement in U.S. and Japanese manufacturing.  In 1981, impressed by his efforts, the Department of Labor offered him a full-time position as an economist in its Bureau of Labor Statistics, which he accepted.  In 1982, Craig moved to the Department of Commerce and continued working as an economist studying the data requirements necessary to provide the best and most accurate measurements of costs and productivity.  Earning scholarships from the Labor and Commerce Departments, Craig studied economics in a graduate program at George Washington University.  At the same time, he continued to publish in academic journals.

In 1986, Craig turned his attention to academia on a full-time basis.  From 1986 through 1990, he worked as an assistant professor and a research fellow in the School of Management at Rensselaer Polytechnic Institute ("RPI") in Troy, New York.  He taught undergraduate and

graduate classes on a variety of subjects, including Business Strategy and Policy, Collective

Bargaining and Industrial Relations, Human Resource Management, and Labor Economics. He

also worked as a research fellow. While still affiliated with RPI, Craig served as a visiting

fellow and lecturer at other universities. For the 1990-1991 academic year, Craig served as a

visiting fellow at the University of Warwick's School of Industrial and Business Studies in

Coventry, United Kingdom. From 1991 through 1993, Craig worked as a visiting scholar and

lecturer at the University of California in Berkeley. He taught graduate-level classes in

Entrepreneurship, Venture Capital, New Venture Marketing, and Small Business Management.

Craig did not stay focused full-time on academia for long. While juggling his academic

responsibilities, Craig looked for opportunities to become more involved in the business world.

For instance, in 1992, before his final semester teaching at Cal-Berkeley, Craig joined a

company called Golf Reservations of America, Inc. in Sherman Oaks, California, which offered

to help customers make reservations at some of the country's most sought-after golf courses.

Craig became the Vice Chairman of the Board of Directors and helped to negotiate joint venture

marketing agreements with companies like American Express and Golf Magazine. While

working with Golf Reservations, Craig was asked by one of its main investors to join Gilman

Securities as acting Chief Financial Officer. From 1994 through 1996, he held both jobs with

Golf Reservations and Gilman Securities at the same time, continuing a pattern of stretching

himself thinly.

Over the next 25 years, Craig held jobs with a series of companies as he tried to find his

place. He worked as an investment banker for Baird, Patrick & Company, Inc. (1996-1997). He

joined Merrill Lynch, Pierce, Fenner & Smith, Inc. as a vice president for its private client group

(1997-1998). He worked as a senior vice president of merchant banking for Trautman,

Wasserman & Company (1999-2001).  He later worked with companies such as Brean Murray & Co., Inc. (2002-2003), 787 Capital Group LLC (2010-2011), Torsiello Securities, Inc. (2007-2013), and John W. Loofbourrow Associates, Inc. (2015-2019).

Beginning in 1998, Craig was interested in becoming an entrepreneur and created several companies in the hopes of starting a successful business.  Craig believed there was an opportunity in the market for merchant banks to finance or acquire small- and mid-market companies, whom he considered to be underserved by the large investment banks.  He formed five companies in pursuit of this objective, each with a different focus.  For instance, in 1998, he formed Concorde Group, Inc. to operate as a financial services company for small- and medium-sized businesses in the United States.  Similarly, in 2001, he formed Concorde Europe Limited with the similar goal of operating in Europe.  In 2015, he created Concorde Group Holdings, which was at the center of the offense, out of the same desire.

While he was pursuing all of those aspirations in the business world, Craig still maintained his interest in academia.  From 1998 to 2002, Craig was a visiting lecturer and scholar-in-residence at the Zicklin School of Business, Baruch College, City University of New York.  From 2016 through 2019, Craig was a visiting researcher with the Max Planck Institute for the Study of Societies – MPIfG in Cologne, Germany.  During the same time period, he also conducted research with UCLA's Institute for Research on Labor and Employment, focusing on finance, macroeconomics, microeconomics, productivity analysis, and industrial relations and collective bargaining.  And he continued to publish.  In the last seven years alone, Craig published the following articles:

- Zabala, Craig and Daniel Luria (2020). "The China Model's Challenge to Democratic Capitalism," *American Affairs*, Volume VI, Number 3 (Fall), pp. 87-104.

- Zabala, Craig and Daniel Luria (2019). "New Gilded Age or Old Normal?" *American Affairs*, Volume III, Number 3 (Fall), pp. 18-37.

- Zabala, Craig Anthony and Jeremy M. Josse (2018). "Shadow Credit in the Middle Market: The decade after the financial collapse." *Journal of Risk Finance*, (Earlycite, October 16, 2018), Volume 19, Number 5, pp. 414-436.

- Buchanan, Bonnie G. and Craig A. Zabala (2017). "Money Laundering and Legal Compliance in the U.S. Financial Services Industry: The Case of Standard Chartered." *The Handbook of Business and Corruption: Cross-Sectoral Experiences*, Michael S. Aßländer / Sarah Hudson (Eds.), Emerald Publishing Limited, pp. 255-278.

- Zabala, Craig A. and Jeremy M. Josse (2014). "Shadow Credit and the Private, Middle Market:  Pre-Crisis and Post-Crisis Developments, Data Trends and Two Examples of Private, Non-bank Lending." *Journal of Risk Finance*, Volume 15, Number 3, pp. 214-233.

A full list of Craig's papers, presentations, and speaking engagements is attached as Exhibit 1.

## III. Craig's Personal Life

While Craig enjoyed professional success, he struggled at times in his personal life.  He married three times, with each marriage ending in divorce.  His first marriage lasted seven years; his second marriage lasted three years; and his third marriage lasted four years.  Craig never had any children.

In 1998, at the age of 46, Craig met Doreen McCarthy, who became the love of his life. Doreen worked as a sculptor, and she and Craig bonded over their shared love of art.  For twenty-three years, they built a life together, living in Doreen's apartment in lower Manhattan. They spent their free time exploring art museums and attending openings, as well as spending time with her extended family.  Because they met later in life, they were careful to keep their finances separate.  To help supplement her income as an artist, Doreen worked as a bookkeeper for many other companies and eventually for Craig's companies.

Even after Craig found love with Doreen, he still suffered heartbreak through this period as he lost most of his closest family members to illness.  His father and mother passed away in 1999 and 2006, respectively.  He also lost three of his five siblings.  His younger sister, Patrice, passed away in 2010.  His younger brother, Jeffrey, passed away in 1997, while his youngest brother, Anthony, passed away in 2016.  With no children, Craig's family circle became smaller and smaller.  As this was happening, he tried to focus on helping others.  James described how "Craig has been there to help our family as we've had to deal with the deaths of our parents and three of our siblings" by providing financial assistance and comfort to the siblings who were left to mourn.  Letter of J. Zabala at 2.

**IV.     Craig's Impact on the Community**

In Exhibits 2 through 24, there are 23 letters to the Court from people who have known Craig well over the course of his life.  The letters describe how Craig has been a positive influence in the lives of many people.  One friend stated that "it's impossible to summarize adequately how much Craig means to my family and how much I respect his intellect and kindness in a single letter."  E. Winkleman Letter at 2.  That friend explained that "Craig has been there for us throughout every major disruption in our lives over the last two decades."  *Id.* at 1.

The letters illustrate how Craig helped people in need.  For instance, he and Doreen opened their home to Bart Keijsers Koning and his young family after he lost his job and home.  Letter of B. Koning at 1.  Mr. Koning observed that Craig "never questioned our situation and offered my children a warm welcome upon their return from school actively engaging with them to make sure they felt at home and were cared for."  *Id.*  When Craig's brother fell ill with a serious health condition and had to leave his job with the Securities and Exchange Commission,

Craig invited his brother to live with him in Albany, New York, to help his brother adjust. Letter of J. Zabala at 1. Jim Zabala also noted that Craig "helped all of my surviving siblings after my mother's death in 2006 by purchasing my parents['] home in Placerville, CA and distributing the funds equally to us" and then "allowed my sister Patrice to live at the home free of rent until her death in 2010." *Id.* at 2.

In smaller gestures, Craig has tried to be thoughtful and considerate of others. When a visiting friend had difficulty with a disability, Craig "would make every effort to see what he could do to facilitate my getting around and getting what I needed" and the friend "never had to ask" because Craig "would anticipate my needs and offer his help." Letter of D. Ehnbom at 1. When another friend expressed concern that his adult daughter could not afford to throw a birthday party, Craig "immediately offered to go buy supplies and surprised [the daughter] by showing up with them." Letter of D. Luria at 3. Another friend, James Moglia, commented that "I found Craig to consistently express his interest in, and respect for, others" and that Craig would ask about "the careers of some of my team or acquaintances to offer guidance or support." Letter of J. Moglia at 1-2. Yet another friend observed that "[w]hen I underwent open heart surgery about seven years ago, Craig was the only non-family person to visit me at the hospital and called me every day during the six month recovery period to ascertain my well-being." Letter of G. Brodsky at 3.

Craig has tried to give to the community through his efforts to support academia and the arts. Darnell Hunt, Dean of Social Sciences (and the former Chair of the Department of Sociology) at UCLA, described how he was "deeply appreciative of [Craig's] commitment to the department, which involved his periodic travels to Los Angeles from New York, his financial support of important department initiatives, and his efforts to help us recruit and retain top

faculty talent."  November 4, 2020 Letter of D. Hunt at 1.  David Cole, a former professor of

mechanical engineering at the University of Michigan, stated that "my experience with Craig is

of a talented, hard-working man who started his career on the assembly line and went on to do

research that made a significant contribution to our understanding of labor's role in American

industry."  Letter of D. Cole at 3.  In more informal ways, Craig has tried to support friends in

the arts.  To cite just one example, an artist in Germany commented that "[h]e always tries to

make private studio visits to see my current work and attends my openings whenever he is in

Germany."  Letter of C. Völker at 2.

## V.      The Circumstances of the Offense

The offense began in 2015 as Craig was trying to raise funding for Concorde Group

Holdings.  Along with others, Craig developed a private placement memorandum to describe the

potential investment in Holdings, which sought to raise up to $25 million.  *See, e.g.*, Exh. 1.  The

private placement memorandum contained a description of how the funds would be used,

including that "[a] second use of proceeds from the Offering is a $3.0 million investment in

Concorde Group" which the private placement acknowledged may be considered as an affiliate

company to Holdings because of Craig's shared ownership interest in the two.  *See, e.g.*, Exh. 25

at 13, 23.  The private placement memorandum was revised from time to time.

To raise money for the company, Craig contacted some potential investors, and a

managing director of Holdings contacted others.  Craig knew that the managing director was not

telling the truth to the investors about how much money had been raised for Holdings, but he

continued to send the managing director to speak with investors.  In particular, although Craig

does not know everything that the managing director said to potential investors, he knew that the

managing director had represented that $24 million had already been raised by Holdings, which

was not true.  In addition, Craig provided false statements to investors, including in PowerPoints that had been prepared by the managing director with similar misrepresentations.  He told himself at the time that he would later correct any false statements to investors, and that he was training the managing director to avoid these kinds of mistakes in the future.  He failed to recognize that those investors were already harmed once they had invested money in Holdings based on false information.  He recognizes now that he failed in his duty to the investors, that he violated 18 U.S.C. § 371 when he agreed to send his managing director to solicit potential investors while knowing of the false representations, and that he hurt the investors as a result of his conduct.

Craig made a second mistake when he accepted any compensation or reimbursement of expenses related to Holdings when money was raised based on false representations.  At the time, he told himself that the private placement memorandum and Regulation Ds filed by Holdings with the SEC informed investors that he could be compensated by Holdings, including expenses that he incurred as he search for potential investment opportunities for Holdings.[1]  Craig recognizes now that it was a mistake for him to accept any compensation or reimbursement from the investor funds when investors were not given accurate information.

He made a third mistake when he used Concorde Group, Inc. to pay for debts that were owed by companies other than Holdings.  At the time, he believed that inter-company loans were a common practice among corporations (which he still believes), that it was an inexpensive way

---

[1]     Holdings filed a series of Form Ds with the SEC.  Here is one example: https://www.sec.gov/Archives/edgar/data/1634096/000154921216000057/xslFormDX01/primary_doc.xml ("The Company reserves the right to pay out of net proceeds the salary owed to Dr. Craig A. Zabala, Chairman of the Board, President & Chief Executive Officer of the Company") (dated August 12, 2015).

to provide credit for Concorde Group, Inc., and that Holdings would receive a premium when it was repaid by Concorde Group, Inc. He also believed that the private placement memorandum accurately advised investors that the money would be invested in Concorde Group, Inc. and that these representations provided transparency to investors. He now recognizes that, with such a small number of investors and with investors not being accurately informed about the amount of money being raised, it was a poor exercise of judgment by him to use an inter-company loan in this circumstance.

Finally, Craig made a fourth mistake when he hired Doreen to perform bookkeeping services on behalf of Holdings and his other companies and to rent space in her apartment for Holdings' records. At the time, he believed that the payments were appropriate under the private placement memorandum because it was part of the investment in Concorde Group, Inc. When he compensated her, he believed that she had earned the money through her bookkeeping services that she provided for many years (for Concorde Group Inc. and other affiliated companies in addition to Holdings) and that it would have cost more to hire a third party to perform those services. Similarly, he believed that it was fair to rent work space in her apartment and that it would have been significantly more expensive to lease space from a third party. He now realizes that he unfairly exposed Doreen to accusations that she should not have received the payments that were made to her for the work she performed. In addition to hurting the investors, Craig realizes that he hurt Doreen too, which he very much regrets. [2]

---

[2]     There is one other mistake that Craig made during this time period and that he regrets. Pursuant to a FINRA request, in June 2019, Craig made a partial production of documents related to his outside business activities and potential participation in securities transactions, but then declined to produce any further documents, thereby violating FINRA Rule 8210. Shortly thereafter, on August 19, 2019, Craig was barred by FINRA from associating with any FINRA member because of that rule violation. Craig signed a Letter of Acceptance, Waiver, and

On September 24, 2020, Craig was arrested and charged in a complaint with three offenses.  After he was released on bail conditions, he directed the undersigned counsel to promptly negotiate a plea agreement with the government.  As a result of these negotiations, Craig entered a guilty plea on October 22, exactly four weeks after the arrest, in an effort to accept full responsibility for his actions.  In addition to the plea, he also signed an agreement to forfeit $4.38 million, the full amount that had been raised from Holdings' investors.

On the same day that Craig was arrested, the Securities and Exchange Commission filed a civil lawsuit against Craig, making similar allegations that he defrauded investors of Holdings. Civil Action No. 20-7880, Filing No. 1 (S.D.N.Y.).  The SEC named Doreen in the complaint as a relief defendant.  In the hopes of accepting responsibility, Craig agreed to settle the case with the SEC and to pay disgorgement of $2,435,816 along with pretrial interest of $349,435.65, which will be offset by money paid pursuant to the restitution ordered in this case.  Craig also agreed to be barred from association with any broker, dealer, investment adviser, municipal advisor, transfer agent, or nationally recognized statistical rating organization.  Finally, Craig is enjoined from violating any securities laws.  While the agreement has been signed with the SEC's enforcement staff, the Commission needs to approve the agreement before it is officially finalized.

On a personal level, Craig's life changed dramatically after the arrest.  Most importantly, Doreen has informed him that she was ending their twenty-three year relationship together. While she has graciously allowed him to live in her apartment pending the resolution of this

---

Consent to settle the matter and voluntarily accepted the bar from FINRA.  Craig acknowledges that it was a mistake not to turn over the full set of materials.

case, their relationship is unfortunately over. In addition, Craig has a number of longtime friends who have refused to speak with him after his arrest. He fully understands that these developments are his fault alone and that he has no one to blame but himself.

## **DISCUSSION**

Title 18, United States Code, Section 3553 directs district courts to "impose a sentence sufficient, but not greater than necessary, to comply" with the purposes that Congress has identified as the objective of a fair sentence. In particular, Section 3553 states that a district court "shall consider" the following factors in rendering a sentence:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

 (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

 (B) to afford adequate deterrence to criminal conduct;

 (C) to protect the public from further crimes of the defendant; and

 (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for the offense under the Sentencing Guidelines;

(5) any pertinent policy statement issued by the Sentencing Commission (as amended by Congress);

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. 3553(a)(1)-(7). "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007).

The Probation Office recommends that Craig be given the maximum Guidelines sentence of sixty months and a further term of supervised release of three years, but that recommendation is greater than what is necessary to satisfy the objectives of Section 3553(a)(2). At the age of sixty-nine, Craig will not commit another offense. Aside from the events in this case, he has lived an admirable life, has not had any encounters with law enforcement over a career that has spanned over fifty years, worked very hard, helped many people, and contributed to the community in many different ways. He has shown remorse, immediately accepted responsibility for his conduct, and searched for ways that he can prevent others from repeating his mistakes.

The objectives of Section 3553 would be satisfied in this case by a sentence of: (i) a term of confinement of a year and a day; (ii) a period of supervised release of three years with an order to complete 500 hours of community service during that time period with a focus on speaking to students about the mistakes that he made;[3] and (iii) restitution of $4.38 million (through the forfeiture order and money judgment agreed by the government). A fine should not

---

[3]     Community service can be ordered as a condition of supervised release pursuant to 18 U.S.C. § 3583. Section 3583(d) provides that, with an exception not applicable here, the Court may require "any condition set forth as a discretionary condition of section 3563(b)," provided that "such condition-- (1) is reasonably related to the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D); (2) involves no greater deprivation of liberty than is reasonably necessary for the purposes set forth in section 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D); and (3) is consistent with any pertinent policy statements issued by the Sentencing Commission pursuant to 28 U.S.C. § 994(a) . . . ." As described in this memorandum, all of those conditions would be met here. Title 18, United States Code, Section 3563(b)(12) allows the Court to order a defendant to "work in community service as directed by the court."

be ordered so that Craig can focus his efforts on repaying the forfeiture and money judgment that he owes. Finally, because of the continuing dangers presented by COVID-19, and because the potential risk to his health at his age, the Court should consider ordering Craig to serve his sentence in home confinement at his brother's house in West Covina, California.

**I      The Weighing of the Nature of the Offense
       and Craig's History and Personal Characteristics**

Under 18 U.S.C. § 3553(a)(1), the nature of the offense should be considered along with the defendant's history and personal characteristics. In this case, the nature of the offense is serious. Before deciding whether to invest in a company, investors deserve – and are required under the law – to receive full and accurate information about the securities they are buying. Craig agrees that he made serious mistakes, that he is fully responsible for his mistakes, and that investors were hurt because of his mistakes. The serious nature of the offense and the harm to investors are the most important reasons why Craig is so remorseful and ashamed of his mistakes.

As described in much greater detail above, Craig's history and personal characteristics mitigate against a lengthier sentence. This is Craig's first offense. He is 69 years old and has lived a law-abiding life prior to the offense. After a modest upbringing, he built a very productive career over fifty years. He worked very hard, likely to the point of over-extending himself at most points of his life. He has influenced the lives of many people in a positive way. He has tried to help people in need. In gestures large and small, he tried to be kind and supportive to those around him. Through his contributions in academia and to the arts, he has supported the community. In academic journals over the last forty years, he has tried to produce thoughtful scholarship on a variety of subjects in the hopes of bettering society.

After the offense, he reacted in a responsible way. He immediately accepted responsibility for his mistakes and sought to enter a plea agreement. He entered a guilty plea with the Court within 28 days after he was arrested. He moved to resolve the SEC's complaint without litigation and has reached a written agreement with its enforcement staff to resolve the matter (pending approval of the Commission). He agreed to a forfeiture order and money judgment of the entire amount of the investments made by Holdings' investors.

Going forward, Craig intends to focus on ways that he can repay his debt to the investors. He agreed to forfeit the full amount of the investments made in Holdings and did not try to contest whether every investor had received false information, which is not fully known to him because the managing director passed away in 2017. His hope is that he can repay the investors with money earned from future employment after he serves any sentence that the Court orders him to complete. He recognizes that it may be difficult for him to find employment at his age and it will not be easy, but he is determined to try.

Craig also recognizes that he owes a debt to society and would like to use speak about his mistakes to students and others in the hopes that they will not repeat them. At Craig's request, Dean Hunt of UCLA's College of Social Sciences has spoken with the chair of the Economics Department at UCLA, and they have agreed that it would be useful to students to hear Craig speak about ethics and his recent experiences. January 4, 2021 Letter of D. Hunt. In particular, they believe there "may be value in inviting him as 1) a speaker in an upper division class with a lab (either finance or industrial organization or a case study strategy class) and/or 2) a special speaker for our students in elite programs focused on finance." *Id.* Craig has also spoken with Claudia Peña and Bryonn Bain, UCLA professors who lead the Prisoner Education Program at UCLA. They have invited him "to develop a course/lecture series to share about his life story

and experiences with the participants in our program," which include UCLA students and presently or formerly incarcerated people. Letter of C. Peña and B. Bain at 1.

We have given careful thought as to why Craig made the mistakes that he did. In a typical case with this type of conspiracy charge, it is usually fairly said that the defendant entered into the conspiracy because of greed. But that does not seem to be an accurate description of what happened here. Instead, Craig's poor decisions were made out of an overly zealous determination and sense of pride to make Holdings and his other companies successful. This determination and pride were driven by his fear of failure. Over the course of his life, Craig had always prided himself on accomplishing tasks that others felt were extraordinarily difficult, whether it was achieving a master's degree and doctorate from UCLA while working as a full-time autoworker or lecturing at prominent universities in the United States and Europe. While his pride and determination (and even fear of failure) served him well in other parts of his life, those traits led him to make the biggest mistakes of his life in this case.

That is why the community service element of the sentence would be particularly appropriate for this offense. This public service would provide a cautionary tale for students who might be faced with a similar situation in the future. It would show students that, regardless of education or past accomplishments, they can lose sight of the importance of full transparency. And Craig can explain, in a very personal way, how the fear of failure, pride, and misplaced determination can lead to harm to others, remorse, and shame that can overshadow whatever prior accomplishments were achieved. A sentence requiring him to perform that kind of community service would be appropriate because it would be tailored to addressing the factors underlying the offense.

## II.     The Proposed Sentence Would Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, and Afford Adequate Deterrence

Craig's proposed sentence would reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence.  The confinement of Craig for a year and a day at the age of 69 (whether in prison or home confinement) would be a significant punishment that would reflect the seriousness of the offense, promote respect for the law, and send a message of deterrence.  Incarceration for any length of time is difficult (even more so in the midst of a pandemic), and it is particularly difficult for people entering prison in their sixties and seventies.[4]  After examining his circumstances, no one would want to follow Craig's path or think that the loss of freedom for a significant amount of time at that age is a lenient outcome, particularly when combined with the need to comply with a forfeiture order and money judgment of $4.38 million.  The community service aspect of the order would further promote respect for the law by providing the public, particularly young people, with a concrete and candid discussion of how these types of mistakes can ruin one's life.

This proposed sentence is in addition to the devastating punishment that Craig has already received for his actions.  He lost his cherished twenty-three year relationship with his domestic partner because of his mistakes, and he will enter his seventies alone.  He lost the reputation that he tried to build over the course of a lifetime.  Longtime friends have refused to speak with him.  He will be barred by the SEC from the activities that formed the basis of his

---

[4]     Even in 2015, well before the pandemic, the Justice Department's Inspector General observed that "[s]everal studies, including one published by the American Journal of Public Health, state that an inmate's physiological age averages 10–15 years older than his or her chronological age due to the combination of stresses associated with incarceration and the conditions that he or she may have been exposed to prior to incarceration." https://oig.justice.gov/reports/2015/e1505.pdf at 1-2 (last visited on January 22, 2021). Moreover, "BOP officials and staff agreed that the combination of these factors expedites the aging process." *Id.*

livelihood for the last twenty-five years. He will not be in a position of responsibility with respect to any raising of funds for anyone at any point in the future. His life has fundamentally changed for the worse since the offense, and those life-altering changes should be considered in deciding what punishment is sufficient but not more than necessary.

### III.    The Stipulated Guidelines Range Would Be More Than Necessary to Satisfy the Objectives of Section 3553

In considering the appropriate sentence under Section 3553, the Court must also consider (i) the kinds of sentences available, (ii) the kinds of sentence and the sentencing range established for the offense under the Sentencing Guidelines, and (iii) any pertinent policy statement issued by the Sentencing Commission (as amended by Congress). 18 U.S.C. § 3553(a)(3)-(5). In this case, the Sentencing Guidelines range stipulated by the parties is 60 months, and the Probation Office agrees with that stipulation. The Probation Office also recommends that the Court impose the maximum sentence of incarceration of 60 months, citing factors such as the number of victims, the amount of the loss, the length of the conspiracy, and Craig's involvement in the offense despite a long history of stable employment. PSR at 26. If the Probation Office's recommendation is adopted, Craig would be sentenced to prison until he is 73 or 74 years old, and he would then be placed under supervised release until he is 76 or 77 years old.

However, the Guidelines sentence would be far more than necessary to meet the objectives of Section 3553 in this case. As described above, that recommendation does not give sufficient weight to Craig's decades-long history of good works or to alternate forms of punishment. It also does not fully reflect the circumstances of the offense. Craig created Holdings in the hopes of building a *bona fide* company, and he worked in furtherance of that goal. This is not a case where there was never an intention to create a company that could

become profitable. Craig developed a private placement memorandum, met with companies to evaluate potential opportunities, signed letters of intent with third party companies for potential deals, and invested time in Holdings. He worked on Holdings for years. It is true that Holdings was not successful and did not generate any significant revenue. And Craig made mistakes in the company's efforts to raise money, which is why some period of confinement and the substantial restitution order would be consistent with the objectives of Section 3553. However, Craig did not create Holdings as a vehicle to defraud investors, which would be a different circumstance worthy of harsher treatment. The maximum sentence for this offense should be given for cases with that kind of aggravating factor. Craig's good intentions in creating Holdings should be weighed as a factor mitigating against imposing the maximum sentence.

A similar mitigating factor should be considered with respect to the money received by Craig for his compensation and expenses, as well as the money that was paid to Doreen McCarthy. This is not a circumstance where no work was performed or where there was no reason to believe that the money had been earned. If that were the case, that would be a different situation worthy of harsher treatment. In this case, Craig honestly believed at the time that he was permitted to accept compensation for his work for Holdings and to reimbursement for his expenses. Similarly, Craig knew Doreen had provided bookkeeping services and rented work space in her apartment for years for Craig's companies without compensation for it, so he never intended for the payment to her to be any kind of gift. He believed that it was included within the private placement memorandum's disclosure that the "use of proceeds from the Offering [of Holdings] is a $3.0 million investment in Concorde Group," Exhibit 25 at 13, 23, which he thought included payments for Doreen's current and past services for Concorde Group. That type of intent does not present the same type of danger as when a company officer is paying

sums of money with no belief that it was earned.  That is another mitigating factor as to why the maximum sentence for this offense should not be imposed in this case.

**IV.    Other Sentences Have Departed From**
**       the Guidelines Range In View of Similar Factors**

Courts must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . . ."  18 U.S.C. § 3553(a)(6).  Craig is the only person who has been charged with this offense in this case, so there is no other defendant in this case with a similar record who has been found guilty of similar conduct.

However, the Court has declined to impose Guidelines sentences in situations where there have been similar mitigating factors, including age, good works, and other characteristics that suggest a lengthy Guidelines sentence would lead to an unreasonably harsh result.  For instance, in *United States v. Navnoor Kang*, Criminal Action No. 16-837, a defendant, a state official, pled guilty to charges of conspiracy to commit securities fraud and conspiracy to commit honest services wire fraud.   The Stipulated Guidelines range was 210-262 months, and the government argued for a sentence of ten years "in light of [the defendant's] egregiousness conduct, his flagrant abuse of his position of public trust, and his pervasive obstruction of justice."  *Id.*, Filing No. 64 at 2.  The Court agreed that "[b]ecause this type of fraud is lucrative and hard to detect, there is a significant need to send a message to others that it will be taken seriously."  *Id.*, Filing No. 69 at 25.  The Court, however, determined that a sentence of 21 months reflected the seriousness of the offense, promoted respect for the law, and afforded adequate deterrence to criminal conduct.  *Id.*, Filing *Id.* at 23-28.  Among other reasons, the Court concluded that it was the defendant's first offense, he had been a good person in many

respects, he had taken care of other people, and he had faced adversity (including discrimination). *Id.* at 25-26.

Similarly, in *United States v. Suresh Hiranandaney, et al.*, Criminal Action No. 14-409, four defendants pled guilty to charges of conspiracy to defraud the federal government in connection with student loans and visas. As part of their plea agreements, the defendants agreed to forfeit $7.4 million of ill-gotten funds. *Id.*, Filing No. 105. For the lead defendant, the sentencing range under the Guidelines was 37-46 months, and the Probation Officer recommended a sentence of 30 months. *Id.*, Filing No. 118 at 14. In that case, the Court determined that the fraud was deliberate, that it stretched over four years, and that there was criminal intent, including in the altering of documents. *Id.* at 42-43. In considering the totality of the factors under Section 3553, the Court sentenced that defendant to twelve months and a day in prison. *Id.* at 45. The Court relied on a series of factors, including the defendant's age (61), all of the other factors in his life showing that he was an extraordinarily good man in many respects; and the serious medical conditions that he and other family members faced. *Id.* at 46.

Every case is different and has unique factors that may lead to different result under Section 3553. However, a similar analysis should lead to a similar result for Craig and urge against the maximum sentence for this offense. The factors weighing against the maximum sentence for the offense include Craig's age, his hard work, his history of several decades of lawful behavior, his good works for others, his contributions to society, his remorse, his prompt acceptance of responsibility, his efforts to look for constructive ways to provide public service in the future, and the significant punishment that he has already received. Similarly, as described in the previous sections, the lack of malice behind the offense (which was driven by Craig's overly zealous determination to make his companies successful and by his fear of failure) should be

another factor that should advise against the imposition of the maximum term of incarceration under Section 371.

**V.      The Need to Provide Restitution to Victims of the Offense**

Section 3553(a)(7) states that the Court must consider the need to provide restitution to victims of the offense.  In this case, the need for restitution should be satisfied by the forfeiture order and money judgment for $4.38 million obtained by the United States and signed by the Court, which can be incorporated into an order of restitution.

**VI.     The Court Should Consider the Possibility of Home Confinement
         In Light of the Continuing Uncertainties of COVID-19**

Ordinarily, in these circumstances, the Court might not consider the possibility of home confinement for a sentence of a year and a day.  However, because of COVID-19, I respectfully request that the Court consider ordering Craig to serve any period of incarceration in home confinement.  The BOP currently reports that there are currently 3,561 inmates and 1,991 BOP staff who have confirmed positive tests for COVID-19 nationwide.[5]  It also states that 41,043 inmates and 3,910 staff have recovered from COVID-19, although the BOP does not report how many of those who have recovered may still be experiencing long-haul symptoms.  *Id.* According to BOP, there have been 202 federal inmate deaths and 3 BOP staff member deaths attributed to COVID-19 disease.  *Id.*

BOP has begun distributing vaccines at prisons, but a prison sentence still presents significant risks to inmates and staff because of the presence of COVID-19.  BOP has stated that "[t]he vaccine is broadly offered to staff, roughly half of whom have opted to vaccinate at

---

[5]      https://www.bop.gov/coronavirus/ (last visited on January 22, 2021).

recipient locations."[6]  It is not clear how many staff and inmates in any particular institution will ultimately agree to the vaccinations, which could lead to significant further illness and exposure. There are still questions about how the vaccines will respond to mutations in the virus, which may be more deadly than the original.[7]

As the Court has previously observed, "[b]ecause it is virtually impossible to enforce effective physical distancing in a prison setting with shared cells, shared bathrooms, and shared dining facilities, the risk of spread of the coronavirus is significantly increased in prison." No. 13 Cr. 66 (JPO), 2020 WL 4195273, at *2 (S.D.N.Y. June 11, 2020).  At the age of 69, Craig is at greater risk of suffering severe health consequences from COVID-19.  Because this is a non-violent offense, and because Craig can be appropriately punished in a way that would reduce the risk of the serious harms of COVID-19,[8] home confinement would be an appropriate form of punishment in lieu of incarceration.

---

[6]    https://www.bop.gov/resources/news/20210116_covid_vaccine_efforts_commended.jsp (last visited on January 22, 2021).

[7]    William Booth, *Boris Johnson Says U.K. Coronavirus Variant May Be More Deadly*, WASHINGTON POST, found at https://www.washingtonpost.com/world/uk-variant-covid-mortality/2021/01/22/86023180-5cd6-11eb-a849-6f9423a75ffd_story.html (last viewed on January 22, 2021).

[8]    If the Court were to consider this option, it could place Craig on probation under the condition that he is subject to home confinement for the same amount of time.  *See, e.g.*, 18 U.S.C. § 3563(b)(19).  By statute, Craig is eligible for probation because he has pled guilty to a Class D felony which requires no minimum term of imprisonment.  *See* 18 U.S.C. § 3561. Under the Sentencing Guidelines, Craig would not be eligible, *see* U.S.S.G. §§ 5B1.1 and 5C1.1(f), but those Guidelines are discretionary after *United States v. Booker*, 543 U.S. 220 (2005).  Even before *Booker*, courts had the power to authorize probation even when the Sentencing Guidelines did not agree.  *United States v. Lahey*, 186 F.3d 272, 275 (2d Cir. 1999). The Guidelines have not been amended since 2018 and should not be relied upon to address risks that the Sentencing Commission could not have reasonably contemplated.  Section 3553 should guide the Court's discretion in making this determination, and home confinement would strike the right balance between punishment and safety.

**<u>CONCLUSION</u>**

For the reasons stated above, Defendant Craig Zabala respectfully requests that the Court enter a sentence of (i) a year and a day of confinement (whether in a prison or in home confinement); (ii) a requirement of at least 500 hours of community service as part of a three year term of supervised release; and (iii) an order requiring restitution of the $4.38 million (through the money judgment and preliminary order of forfeiture that was previously agreed with the government and signed by the Court).

Respectfully submitted,


AKERMAN LLP

/s/  Michael P. Kelly
Michael P. Kelly
750 Ninth Street, N.W.
Washington, D.C. 20001
Telephone:  (202) 393-6222
Facsimile:  (202) 585-6223
michael.kelly@akerman.com

## CERTIFICATE OF SERVICE

I hereby certify that, on January 22, 2021, a copy of Defendant Craig Zabala's Sentencing Memorandum was filed using the CM/ECF electronic filing system. Service of this filing will be made on the person listed below by operation of the Court's electronic filing system, and parties may access these filings through the Court's electronic filing system.

Joshua A. Naftalis
Assistant United States Attorney
United States Attorney's Office
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007
joshua.naftalis@usdoj.gov
(212) 637-2310

*Attorney for the United States*

                                         /s/ Michael P. Kelly
                                         *Attorney for Craig Zabala*