

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 27, 2021

BY CM/ECF

The Honorable J. Paul Oetken
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:    United States v. Craig Zabala
                20 Cr. 564 (JPO)

Dear Judge Oetken:

      The Government submits this letter in advance of the sentencing of defendant Craig Zabala, scheduled for February 5, 2021. For the reasons set forth below, the Government respectfully requests that the Court sentence the defendant to a sentence within the applicable Guidelines range of 60 months' imprisonment.

      A.    The Offense Conduct

      The Government agrees with the statement of offense conduct set forth in the presentence investigation report, dated January 14, 2021 ("PSR"). (PSR ¶¶ 6-37).

      1.    The Defendant and Relevant Entities

      Craig Zabala was the Chairman, CEO, and President of various affiliated and intertwined purported financial services companies: Concorde Group Holdings, Inc. ("Holdings"), Concorde Group, Inc. ("Group"), Blackhawk Capital Group BDC, Inc. ("Blackhawk"), DBL Holdings, LLC, d/b/a "Drexel Burnham Lambert" ("DBL"), Concorde Investment Managers, LLC ("CIM"), and Concorde Europe, Ltd. ("Concorde Europe"). In August 2019, FINRA barred Zabala from the broker-dealer industry, including because of his failure to cooperate with a FINRA investigation.

      Holdings was a Delaware corporation formed in 2015, with an office in Jersey City, New Jersey, and a mailing address in New York, New York. Holdings purported to provide financial services, including merchant banking, investment banking, asset management, and securities brokerage services, to entrepreneurs, investors, and businesses in the middle market, meaning small to mid-sized companies with revenue and market capitalizations of less than $1 billion, in North America, Europe, and Asia. Holdings did not have any meaning business —

it was a shell company. Holdings' purported affiliates included Zabala's other companies: Group, DBL, Blackhawk, CIM, and Concorde Europe. Zabala was a majority owner of Holdings.

Before forming Holdings, Zabala had incorporated Group in 1995. In addition to having a similar name to Holdings, Group purported to provide the same types of financial services as Holdings. And like Holdings, Group does not appear to have done any meaningful business. Group's purported affiliates included DBL, Blackhawk, CIM, and Concorde Europe. Zabala was a majority owner of Group.

2. Zabala Raises Approximately $20 Million from
Group, Concorde Europe, and Blackhawk Investors

While the defendant did not plead guilty to defrauding investors in his prior companies, his prior solicitations, particularly of investors in Group, are relevant to the charged scheme.

Between 2001 and 2014, Zabala and others raised approximately $20 million from investors through various unregistered equity, options, and debt offerings, including as follows: Between 2001 and 2014, Group raised approximately $18 million. Between 2001 and 2002, Concorde Europe raised approximately $359,000. In 2007, Blackhawk raised approximately $2.1 million.

One of the largest investors in Group and DBL was the family office of a wealthy German family (the "Family Office"), whom Zabala solicited in July 2008. The Family Office purchased 250,000 shares of Group at a price of $8 per share, for a total investment of $2 million, and agreed to invest $5 million in DBL. During the solicitations, Zabala represented, among other things, that Group had raised approximately $17 million from investors. Thereafter, the Family Office learned that (i) Group had only raised approximately $2.3 million, not $17 million, as Zabala had represented; (ii) Zabala had used the approximately $2 million that the Family Office had invested in Group to repay a purported Group loan, and not for Group's business, as Zabala had represented; and (iii) Zabala had sold shares in Group to other investors for only $1 per share shortly before the Family Office had paid $8 per share. In 2009, the Family Office filed a civil suit in this District against Zabala, Group, and DBL, alleging, among other things, securities fraud and common law fraud, which suit was subsequently settled.

3. Zabala Defrauds Holdings Investors Out of $4.38 Million

After Zabala settled the lawsuit with the Family Office involving Group, Zabala started to raise money for Holdings — which as noted had a substantially similar name and purported business purpose. Specifically, from 2015 through 2020, Zabala and others perpetrated a scheme to defraud at least approximately 17 investors out of at least approximately $4.38 million in Holdings notes, warrants, and equity. Almost all of these investors invested in a private offering by Holdings of $25 million in senior secured notes with attached warrants paying 13 percent

interest (the "Holdings Offering").[1] Unbeknownst to these investors, Zabala (i) solicited the investments through false and misleading statements; (ii) failed to use investors' funds as promised, including to build Holdings purported business by investing in and buying other financial services companies; and (iii) converted investors' money to his own use, including to repay Group investors' in a Ponzi-like fashion.

First, and for example, Zabala falsely represented that the proceeds from the offerings would be used to grow Holdings' purported merchant banking business by investing in or rolling up other financial services companies. In truth and in fact, and as Zabala well knew, Holdings did not make any investments in or buy other companies; it was a shell company. Second, Zabala falsely represented that Holdings was successfully raising money from investors, claiming that Holdings had raised nearly all of the $25 million targeted in the Holdings Offering and that the Family Office, a sophisticated institutional investor, had invested millions of dollars in Holdings. In truth and in fact, and as Zabala well knew, Holdings only raised a few million dollars (the majority from one investor), and the Family Office never invested in, and never committed to invest in, Holdings. Third, Zabala falsely represented to Holdings investors that Holdings would soon have an initial public offering ("IPO"), which would result in large profits to Holdings investors. In truth and in fact, and as Zabala well knew, Holdings was not close to an IPO. Finally, Zabala converted at least approximately 70 percent of the approximately $4.38 million in Holdings investor funds in the form of cash withdrawals and other transfers to himself, payments to his girlfriend, payments of his personal credit card bills, and repayment of investors in Group in Ponzi-like fashion.

      a.    <u>Investor 1</u>

The largest investor in Holdings was an individual ("Investor 1"), who invested approximately $2.9 million out of the approximately $4.38 million that Zabala raised. Zabala was introduced to Investor 1 in 2016 by a co-conspirator who was not charged ("CC-1"). Zabala then solicited Investor 1, by phone, in person, and in writing, including through private placement memoranda ("PPMs"), to invest in the Holdings Offering, and offered Investor 1 a paid job at Holdings, on the condition that Investor 1 invest. During these solicitations, Zabala falsely represented, among other things, that Investor 1's investment in Holdings would be used to grow Holdings' business by investing in and buying other financial services companies in advance of an IPO; that Holdings had raised nearly all of the $25 million targeted for the Holdings Offering; and that the Family Office was investing, or had invested, several million dollars in the Holdings Offering. Between December 2016 and January 2018, Investor 1 invested a total of approximately $2.9 million in Holdings to purchase Holdings notes, warrants, and equity, including as follows.

On October 29, 2016, Zabala sent Investor 1 an email and attached various offering documents, including a PPM for the Holdings Offering. In the email, Zabala falsely represented: "We are looking to secure a $850,000 tranche in order to complete our [$25 million] Offering." In a fact sheet attached to the email, Zabala falsely represented: "[Holdings] has already raised

---

[1] The PPMs generally represented that the notes would have a maturity of five years from the date of issuance and would pay interest at a rate of 13 percent payable semi-annually.

$24.2 million in its [$25 million] Offering," and "Returns are estimated as high as 11,500% of the warrant exercise price following the public offering on the [Toronto Stock Exchange]."

On November 2, 2016, CC-1 — who never invested in Holdings — emailed Zabala: "I just spoke to [Investor 1]. . . . [H]e promised he will review the entire package by late Friday/Saturday. . . . He asked me if I invested and I told him I put in $75,000. Please remember that $$$ number if he asks you. If he comes through, there's a good possibility he'll tell a few of his friends!"

On December 21, 2016, Zabala emailed Investor 1 an executed copy of a subscription agreement for Investor 1's $150,000 investment in the Holdings Offering, signed by Investor 1 and Zabala. A little over a week later, on December 30, 2016, Investor 1 wired $150,000 to a Holdings bank account in New York, New York (the "Holdings Account"). Before the wire, the Holdings Account had a total balance of $3,054. That same day, Zabala transferred $55,000 from the Holdings Account to a Group bank account in New York, New York (the "Group Account"). Before the transfer, the Group Account had a total balance of $4,555. Also that same day, Zabala wired CC-1 $16,000 from the Group Account. Between January 23, 2017 and March 9, 2017, Zabala wired CC-1 an additional $15,000 of Holdings investors' money from the Group Account.

On January 9, 2017, Zabala emailed Investor 1 a PowerPoint that falsely represented: "[Holdings] has already raised US$24.4 million out of its US$25.0 million Offering of Senior Notes." On March 27, 2017, Investor 1 invested an additional approximately $100,000 in the Holdings Offering by wiring money to the Holdings Account. Before the wire, the Holdings Account had a total balance of $12,276. Over approximately the next three weeks, Zabala transferred $43,500 from the Holdings Account to the Group Account, and Zabala wired CC-1 $15,000 from the Group Account.

On April 28, 2017, Investor 1 invested an additional $300,000 in the Holdings Offering by wiring money to the Holdings Account. Over approximately the next three weeks, Zabala transferred $99,000 from the Holdings Account to the Group Account. On May 9, 2017, Zabala wired CC-1 $5,000 of Holdings investors' money from the Group Account.

Between June 2, 2017 and January 5, 2018, Investor 1 invested an additional $2.35 million in the Holdings Offering by wiring money into the Holdings Account.

Notwithstanding the representations in Holdings' PPMs and representations made by Zabala, Holdings never paid a cash dividend of 13 percent on the Holdings senior notes. Instead, Zabala told Investor 1 that the dividends would be paid in-kind in Holdings stock because Holdings did not have enough capital to pay cash dividends. Although Investor 1 initially objected to in-kind dividends, Investor 1 ultimately agreed to convert the Holdings notes and attached warrants to Holdings common stock, including on May 11, 2017 and January 24, 2018.

As discussed, in truth and in fact, Holdings had not raised approximately $25 million, having only raised a few million dollars in total, the majority of which was from Investor 1; Holdings did not invest in or buy other financial services companies; Holdings was not close to

an IPO; and the Family Office never invested in, or committed to invest in, the Holdings Offering or otherwise.

b. Investor 2

In 2016, a Holdings Managing Director, a co-conspirator who was not charged and former colleague of Investor 2 ("CC-2"),[2] introduced an individual ("Investor 2") to Zabala. Thereafter, Zabala and CC-2 solicited Investor 2, both orally and in writing, including through PPMs, to invest in the Holdings Offering, and offered Investor 2 a paid job at Holdings, on the condition that Investor 2 invest. During the solicitations, Zabala and CC-2 falsely represented, among other things, that Investor 2's investment in Holdings would be used to grow Holdings' business by investing in and buying other financial services companies; that Holdings had already raised approximately $24 million out of the $25 million targeted for the Holdings Offering; and that the Family Office had invested in the Holdings Offering.

Between September 6, 2016 and October 19, 2016, Investor 2 invested $150,000 in the Holdings Offering by wiring money into the Holdings Account. As noted, in truth and in fact, Holdings had not raised approximately $25 million, having only raised a few million dollars in total; Holdings did not invest in or buy other financial services companies; and the Family Office never invested in, or committed to invest in, the Holdings Offering or otherwise.

c. Investor 3

Beginning in 2015, CC-2 and Zabala solicited an individual ("Investor 3"), both orally and in writing, including through PPMs, to invest in Holdings notes and attached warrants, and falsely represented that Investor 3's investment in Holdings would be used to grow Holdings' business by investing in and buying other financial services companies in advance of an IPO.

On August 18, 2015, Investor 3 invested $100,000 in the Holding Offering by wiring money into the Holdings Account. Before the wire, the Holdings Account had a total balance of $5,560. Over approximately the next two weeks, Zabala transferred $55,000 from the Holdings Account to the Group Account. On June 9, 2016, Investor 3 invested an additional $100,000 in the Holdings Offering by wiring the money to the Holdings Account. Over the next two weeks, Zabala transferred $55,000 from the Holdings Account to the Group Account. In 2017, Zabala falsely represented to Investor 3 that Holdings was approximately $2 million away from raising the $25 million targeted for the Holdings Offering, at which point Holdings would do an IPO, and that the Family Office was a large investor in Holdings.

As noted, in truth and in fact, Holdings did not invest in or buy other financial services companies; Holdings had not raised approximately $25 million, having only raised a few million dollars in total; Holdings was not close to an IPO; and the Family Office never invested in, or committed to invest in, Holdings.

---

[2] CC-2 died in 2017.

d. <u>Investor 4</u>

In late 2018, Holdings' Director of Operations, a co-conspirator who was not charged ("CC-3"), introduced an individual ("Investor 4") to Zabala. Zabala and Investor 4 initially spoke by phone, and then Zabala came to see Investor 4 in person and sent Investor 4 written communications, including a PPM. During their communications with Investor 4, Zabala and CC-3 solicited Investor 4 to invest approximately $100,000 to purchase 200,000 shares in Holdings common stock at a price of $0.50 per share, which was represented to be a "family price," and offered Investor 4 a paid job at Holdings, on the condition that Investor 4 invest in Holdings. During these solicitations, Zabala and CC-3 falsely represented that Investor 4's investment in Holdings would be used to grow Holdings' business by investing in and buying other financial services companies in advance of an IPO, and that Holdings' IPO would take place in early 2019, a few months later, at a price of between $50 and $100 per share.

In November 2018, Investor 4 agreed to invest $55,000 to purchase 110,000 shares of Holdings common stock at a price of $0.50 per share. Between November 8, 2018 and January 2, 2019, Investor 4 wired $55,000 to the Holdings Account. In December 2018, Zabala told Investor 4 that the value of Holdings stock had risen from $0.50 per share to $1 per share because a German investor — *i.e.*, the Family Office — had invested in Holdings.

As noted, in truth and in fact, Holdings did not invest in or buy other financial services companies; Holdings was not close to an IPO; and the Family Office never invested in, or committed to invest in, Holdings.

e. Zabala Stops Soliciting Potential Investors
<u>Who Asked For Too Much Information</u>

On September 12, 2016, Zabala sent an email to an employee of a placement agent, who was conducting due diligence on Holdings, and falsely represented: "Salary a non-issue at this time. Holdings has paid no salaries or benefits to date to executives and will not until the Offering is closed. And then salaries and benefits will be at reduced levels until the closing of the RTO/Secondary Offering."

On October 27, 2016, an employee of a placement agent emailed Zabala and wrote, in substance and in part: "My partner . . . and I met with a party that could potentially move the concord [sic] offering. This is a very skeptical group, and they like some sort of evidence that the majority of the capital is raised. . . . Can we supply them anything. Blacked out info, wire, sub agreement, anything." That same day, Zabala responded and wrote, in substance and in part: "We are in late negotiations to complete the $800,000 tranche with U.S. parties and will not be proceeding with you and your prospects in our offering." Also that same day, Zabala forwarded the emails to [Holdings' Chief Operating Officer, a co-conspirator who was not charged ("CC-4")], and wrote: "What a waste of time!!!!"

    4.  <u>Zabala Misappropriates Holdings Investor Funds</u>

    As noted above, Holdings investors invested at least approximately $4.38 million in Holdings between 2015 and 2019. Bank statements for Holdings and Group — for which Zabala was the only signatory — reflect that he misappropriated approximately 70 percent of those funds as follows:

    First, and significantly, Zabala did not use any Holdings investor money to make investments in or buy other companies. Second, Zabala used approximately $1,218,657, approximately 28 percent, of Holdings investor money to repay non-Holdings investors, including to repay Group investors in a Ponzi-like fashion. For example, on February 6, 2018, Zabala sent approximately $549,657 in Holdings investor money to a Group investor (the "Group Investor") to repurchase the Group Investor's Group common stock as part of a settlement with Group. That transfer to the Group Investor was made shortly after Investor 1 had invested approximately $1 million in Holdings, on January 5, 2018.

    Third, Zabala received approximately $640,356 of Holdings investor money, including through cash withdrawals, and used another approximately $599,468 of Holdings investor money to pay his personal American Express card bill. Fourth, Zabala sent approximately $733,924 of Holdings investor money to his girlfriend.[3] Finally, Zabala used approximately $541,987 of Holdings investor money to pay the purported salaries of CC-3 and CC-4.

    5.  <u>Zabala's July 10, 2019 FINRA Testimony</u>

    On July 10, 2019, the Financial Industry Regulatory Authority ("FINRA") took Zabala's testimony, under oath.

    During this testimony, Zabala was unable to say how much, if any revenue either Holdings or Group had ever generated, other than to state that Holdings had accrued interest from a purported $3.5 million line of credit that Holdings had extended to Group. Zabala also admitted to using Holdings money to repay Group investors, including using more than $500,000 of Holdings investor money to repurchase Group common stock from the Group Investor.

    Zabala was further asked, "Is it accurate to say that the interest payments are being made with capital that was raised [from Holdings investors] because Holdings does not have any operating cash flows coming in?" He answered, "Well, let me answer that a certain way. The answer is yes. But it's no different than the EU bailing out Greece."

    Zabala testified that Holdings does not have any salaried employees. When asked for the names of Holdings' employees, Zabala did not indicate the Girlfriend was an employee.

---

  [3] The defendant's girlfriend was not listed as an employee in Holdings PPMs, nor do Holdings' payroll records reflect that she was an employee.

Finally, Zabala claimed that the Holdings Board of Directors, which was made up of Zabala and CC-3, had purportedly passed a resolution prohibiting Holdings from disclosing the information and documents that FINRA had requested.

B.      The Guilty Plea

The defendant was arrested on September 24, 2020 pursuant to a criminal complaint, charging him with conspiracy to commit securities fraud and wire fraud, securities fraud, and wire fraud.  On October 22, 2020, Zabala waived indictment and pled guilty, pursuant to a plea agreement, to Count One of Information 20 Cr. 564 (JPO), which charged him with conspiracy to commit securities fraud and wire fraud.  The defendant also agreed to forfeit $4.38 million and to pay restitution of $4.38 million.

C.      The Applicable Sentencing Guidelines

The Probation Department's Sentencing Guidelines calculation of 60 months' imprisonment is consistent with the stipulated Guidelines sentence in the plea agreement (PSR ¶¶ 42-54, 106).

D.      The Appropriate Sentence

Under the factors set forth in 18 U.S.C. § 3553(a), the Government respectfully submits that the Court sentence the defendant to a 60-month term of imprisonment.

First, and as the defendant concedes, he participated in a "serious" offense:  he conceived of and led an offering fraud scheme that raised approximately $4.38 million for a fake merchant bank, Holdings.  (Zabala Br. 7).  Zabala and his coconspirators made numerous false and misleading representations to induce their victims to invest, falsely representing that (a) the proceeds from the offerings would be used to grow Holdings' purported merchant banking business; (b) Holdings had raised nearly $25 million in the Holdings Offering; (c) the Family Office had invested millions of dollars in Holdings; and (d) Holdings would soon have an IPO, which would result in large profits to Holdings investors.  Moreover, Zabala converted at least approximately 70 percent of Holdings investor funds in the form of cash withdrawals and other transfers to himself, payments to his girlfriend, payments of his personal credit card bills, and repayment of investors in Group in Ponzi-like fashion.  By lying repeatedly to his victims, investors who trusted Zabala lost millions of dollars.

In his letter to the Court, Zabala asserts that he did not commit the fraud "because of greed," but because of "an overly zealous determination and sense of pride to make Holdings and his other companies successful," and that he "did not create Holdings as a vehicle to defraud investors."  (Zabala Br. 19, 22).  Zabala fails to acknowledge that Holdings appears to have been a fraud from its inception.  There is no evidence that Holdings was ever a real business or that Zabala ever took any steps to turn it into the merchant bank he claimed it would be.  Indeed, one of the ways Zabala enticed investors into investing was by offering them jobs at Holdings, jobs that they were generally not qualified for.  Rather, it appears that Zabala started Holdings as a way

to repay Group investors[4] and fund his lifestyle. Thus, contrary to Zabala's claim that the Holdings fraud was a "mistake" (Zabala Br. 20), the scheme was born of greed, plain and simple — as evidenced by the fact that Zabala's sentencing submission fails to address his misappropriation of the vast majority of investor funds.

Second, and relatedly, the need for just punishment, to promote respect for the law, and for general and specific deterrence militate in favor of a serious sentence. As noted, Zabala's Holdings scheme went on for years, from 2015 to 2020. What is more, it appears that this scheme was born of a need to raise money to repay investors from his prior schemes. When investors are defrauded, it is important that the Court fashion a sentence that sends a message that such conduct will be punished.

Third, while the Government is mindful of the defendant's age, the COVID-19 pandemic, the defendant's willingness to plead guilty quickly, and the defendant's commitment to try to help others learn from his misconduct, the Government respectfully submits that a sentence of incarceration is appropriate nonetheless.

Accordingly, the Government respectfully submits that a Guidelines sentence is appropriate.

E.   Restitution and Forfeiture

The Government also requests that the Court order the defendant to pay restitution totaling $4.38 million to the victims of his offense, on a schedule to be set by the Court. (PSR ¶¶ 116 & pp. 25).[5] Consistent with the Order already entered by the Court, the Government also requests that the Court order the defendant to forfeit $4.38 million. (Dkt. 16; PSR ¶¶ 118, 119).

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

By:   /s/
Joshua A. Naftalis
Assistant United States Attorney
(212) 637-2310

cc:   Michel Kelly, Esq.

---

[4]   As noted, Zabala had previously raised $18 million from Group investors, with Group having a very similar name to Holdings and purporting to be in the same type of merchant banking business as Holdings. Moreover, it appears that Zabala made similar representations to Group investors, as he did to Holdings investors, including that Group had raised more money than it really had.

[5]   The Government will submit a proposed order.